**GARY SANDERS**                                                        **PLAINTIFF**

**v.**

**BRIGETTE OWENS, et al.**                                             **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' motion for summary judgment (DN 17).

Plaintiff has responded (DN 23) and Defendants have replied (DN 29). This motion is now ripe

for adjudication. For the reasons that follow, Defendants' motion is GRANTED IN PART AND

DENIED IN PART.

### BACKGROUND

Plaintiff Gary Sanders was a physical education teacher at Stopher Elementary School

("SES"), a part of the Jefferson County school system, during the 2008-2009 school year. In

January of 2009 Sanders received a written reprimand for insubordination and was suspended

without pay in September of that year. While Defendants assert these disciplinary actions arose

from several instances where Sanders behaved improperly toward staff and parents, he claims

they were premised on his race and negative statements he made about the United Negro College

Fund ("UNCF"). Sanders brings this action against Brigitte Owens, Carolyn Meredith, Emil

Salman, and the Jefferson County Board of Education ("the Board"). Owens is the principal at

SES, Meredith is the assistant superintendent of the Jefferson County schools, and Salman is

Elementary Liaison between the Board and SES.

This lawsuit has its genesis during an *ad hoc* meeting of SES's public relations

committee on January 6, 2009.  Sanders was one of several staff members at SES who participated on this committee.  There, an administration official asked the attendees for a volunteer to be the fund-raising coordinator of the UNCF.  Sanders states in his deposition that the official was the "right-hand girl" of Owens.  No one spoke up to take the position and eventually the official accepted the responsibility herself.  The following day, Sanders spoke with Owens in her office about the committee meeting and the official's solicitation for the UNCF, saying he felt pressured to volunteer.  Sanders also asked Owens why SES "didn't just have a college fund or a Louisville college fund that doesn't discriminate by race?"  DN 17-2 at 10.  When Owens responded that this was the Board's policy, he persisted, questioning why she could not "stand up" and make a change to a policy that he believed was a "kind of reverse discrimination."  *Id*. at 10.  Owens replied that such decisions were up to the Board and terminated the conversation.  The next day, Sanders said he found several flyers in his mailbox at SES about the UNCF.

In the days following this conversation, Sanders says Owens became more demanding and hostile toward him.  Their issues reached a head during an altercation on the morning of January 13, 2009.  In an email the day before, Owens suggested that Sanders volunteer for another SES program, the Fund for the Arts Campaign ("FAC").  Sanders received the email at 11:09 a.m.  His reply followed after the close of business at 8:33 p.m. and indicated he was not interested in the position for a variety of reasons.  On the morning of January 13, as he was signing in for work at SES's office, Sanders says Owens confronted him and asked whether he would volunteer for the FAC.  Responding, Sanders asked her if she had received the email from the previous night.  Sanders and Owens went back and forth at least twice, with Owens asking

for an answer and Sanders referring her to his email.  Finally, Owens asked him whether he was refusing to give her a direct answer.  He then asked that the two retire to her office where they could speak privately.  In her office, Sanders claims he again told Owens the answer to her query was in his email.  With this, Owens dismissed Sanders from her office and indicated that he should contact his union representative.  On January 22, 2009, Sanders received a written reprimand for refusing to answer Owens's questions ("January Reprimand").[1]  Meredith would go on to deny Sanders's appeal of this reprimand.

On April 6, 2009, Sanders received a Comprehensive Teacher Performance Evaluation ("April Evaluation").  In the section "Demonstrates Professional Leadership," Owens gave Sanders the lowest mark.  It was accompanied by the following explanation: "Mr. Sanders was given several opportunities to show his professional leadership abilities by assuming the position of coordinator for the Fund for the Arts and UNCF; however he declined both opportunities." DN 17-10 at 17.  Owens noted three other reasons in this section why Sanders had not shown professional leadership.  Of the ten total categories in the April Evaluation, he received the highest possible score in eight.

In the spring of 2009, there were more issues with Sanders's behavior.  Owens received a complaint from a parent who observed Sanders make politically charged remarks while teaching a fourth and fifth grade class.  Sanders commented to a secretary at SES that he was going to make Owens's life as miserable as she had made his.  Sanders made disparaging remarks about

---

[1] The January Reprimand also states Sanders declined to answer a second question during this confrontation - whether he had input certain grades into SES's computer system.  Sanders does not recall being asked by Owens about the grades on the morning of January 13, 2009. Despite Owens's affirmations to the contrary, the facts are taken in the light most favorable to Sanders.

Owens to two members of the Parent Teacher Association ("PTA"), describing their disagreement over the UNCF and saying that Owens was having a sexual relationship with a prominent educator in Louisville. Sanders also indicated he planned on calling in sick to SES's field day because he was upset about his problems with Owens. The PTA members further claimed Sanders used the term "nigger" several times throughout the conversation, a charge he denies. Finally, in May of 2009, Sanders got into an argument with a parent in the parking lot of SES. Although there is some dispute about the event, witnesses to the exchange raised concerns with Owens about Sanders's behavior.

In response to these incidents, Owens scheduled a meeting with Sanders and his union representative on May 14. There, Sanders received copies of the complaints and was asked to explain his actions. In recalling the incident with the parent in the parking lot, Sanders admitted to being angry and raising his voice, but said the parent had disrespected him. When Owens said she had never lost her temper with a parent, Sanders asked her what she would do if "a parent came to you ever and yelled at you and called you a nigger . . . ?" DN 17-3 at 1. Owens, an African American, took offense and ended the meeting. Sanders insists his use of the word was an analogy to illustrate how all educators are capable of losing their tempers. Several days later, Owens issued another written reprimand for rudeness to the parent in the parking lot and for "failing to practice effective listening and conflict resolution." DN 17-9 at 15.

Following the meeting of May 14, Owens reported these incidents to Meredith and the Board. She also temporarily placed Sanders in a non-teaching role at SES. An investigation was conducted by the Board ("Investigation") that confirmed Sanders made derogatory remarks, was unprofessional toward parents, spoke with the PTA members about his personal and professional

issues with Owens, and had made threatening statements about Owens to the SES secretary. During the Investigation, Owens described six principal concerns she had with Sanders's behavior. The sixth set out that in January of 2009, "[Sanders] advised [Owens] of his unwillingness to coordinate the [UNCF] initiative, stating he thought the fund was racist." DN 17-6 at 2. In the end, the Investigation found Sanders had conducted himself inappropriately. The findings were put into a written report dated June 17, 2009 ("Investigation Report"). As a result of the Investigation, on September 15, 2009, Salman suspended Sanders for five days without pay and transferred him to Zachary Taylor Elementary School ("September Suspension"). Sanders's appeal of this discipline was ultimately denied, as was his appeal of the reprimand stemming from the parking-lot incident.

This lawsuit was filed in the Jefferson County Circuit Court between the due process meeting of May 14, 2009, and the September Suspension. Sanders brings claims pursuant to 42 U.S.C. § 1983 and KRS § 344.450. Specifically, he alleges the following: (1) the January Reprimand, Meredith's denial of his grievance regarding the same reprimand, and the September Suspension were in response to his statements about the UNCF and his refusal to volunteer for the UNCF and FAC, all in violation of his First Amendment rights; (2) this disciplinary action constituted reverse race discrimination, in violation of the Kentucky Civil Rights Act ("KCRA"); (3) the September Suspension was in retaliation for filing his lawsuit, in violation of his First Amendment rights and the KCRA; and (4) the due process hearing on May 14 was in violation of his due process rights under the Fifth and Fourteenth Amendments. This motion for summary judgment has followed.

**STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I. First Amendment Claim of Retaliation

Sanders advances that the January Reprimand and September Suspension were issued in part because he declined to be the fund-raising director for the UNCF, for questioning the legitimacy of the organization and its mission, for refusing to act as the fund-raising director for

6

the FAC, and for filing this lawsuit. He says these actions violate his First Amendment freedoms of speech and association.

"[A] government employee retains [his] First Amendment right to comment on matters of public concern without fear of reprisal from the government as employer." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185 (6th Cir. 1995) (citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)). For government employees to successfully maintain a claim of retaliation in violation of the First and Fourteenth Amendments, they must show the following:

> (1) the plaintiff was engaged in a constitutionally protected activity; (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585-86 (6th Cir. 2008) (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)); *see Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010). Courts confront actions under both the First Amendment's freedom of speech and association with an identical analysis. *See Boals v. Gray*, 775 F.2d 686, 692-93 (6th Cir. 1985). Below, the Court addresses each of these elements in turn.

### a. Constitutionally protected activity[2]

"[T]he question of whether, in a First Amendment retaliation action, a public employee's speech is protected is one of law . . . ." *Fox*, 605 F.3d at 350-51. It is a two-step analysis. First, the court must review the employee's speech and determine if it "may be fairly characterized as

---

[2] The Court does not address whether filing this lawsuit is constitutionally protected activity because it concludes there is an insufficient causal nexus between the September Suspension and Defendants alleged retaliatory motives. *See infra* section I(c)(2). Since the lawsuit is only linked to the September Suspension, its discussion in this section is unnecessary.

constituting speech on a matter of public concern." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006).  If so, the court must balance the interests of the employee in making such statements with the interest of the employer "'in promoting the efficiency of the public services it performs . . . .'" *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 893 (6th Cir. 2003) (quoting *Pickering v. Bd. of Educ. of Twp. High Sch., Dist. 205*, 391 U.S. 563, 568 (1968)).  The Supreme Court curtailed the bounds of free speech in *Garcetti v. Ceballos* when it found that statements made pursuant to a public employee's official duties were not protected by the First Amendment.  547 U.S. 410, 421 (2006).

Matters of public concern generally touch upon political, social, or other important issues of the community.  *Connick*, 461 U.S. at 146.  "When examining the content of speech, the proper inquiry is not what might incidentally be conveyed by the fact that the employee spoke in a certain way, but the point of the speech in question." *Taylor v. Keith*, 338 F.3d 639, 645 (6th Cir. 2003) (citation and quotation marks omitted).  The Seventh Circuit has characterized the distinction between public and private speech as "the difference between an employee complaining about matters private to himself, such as whether he was being paid enough or given deserved promotions, as compared to an employee who is engaged in whistle blowing or otherwise going public with matters in which the public might be expected to take an interest." *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1349 (7th Cir. 1995) (citing *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994)).  The phrase "public concern," does "not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; [it] mean[s] matters in which the public might be interested, as distinct from wholly personal grievances . . . and casual chit-chat." *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194,

197 (7th Cir. 1996).

"Issues such as racism and sexism have long been considered matters of public concern . . . ." *Draper v. Logan Cnty. Pub. Library*, 403 F. Supp. 2d 608, 614 (W.D. Ky. 2005) (quoting *Perkins v. O'Malley*, No. 94 C 7029, 1996 WL 316894, at *4 (N.D. Ill. June 10, 1996)). Taken in the light most favorable to Sanders, the thrust of his discussion with Owens was his concern that SES and the Board were discriminating against children in deciding how to distribute scholarship funding. The intent of his speech was to address the multiethnic makeup of SES and ask Owens to reevaluate the Board's connection and support of the UNCF. These statements did not target Sanders's private interests but instead a policy he considered racially biased. Courts have repeatedly found statements about race and racial discrimination to fall within the realm of public concern. *See e.g.*, *Connick*, 461 U.S. at 146 ("[S]tatements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern . . . ."); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001) (teacher's classroom speech on race was matter of public concern); *Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000) (citation omitted) ("[R]acial discrimination is inherently a matter of public concern."); *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 300 F. Supp. 2d 836, 860 (W.D. Wis. 2004) (plaintiff's objections to depiction of racial minorities in newspaper was matter of public concern). That the Board's and SES's affiliation with the purportedly discriminatory organization arose in the context of student scholarship opportunities is an issue of interest to the community at large. For that reason, the Court believes Sanders's speech and declination of the UNCF position was a matter of public concern.

Defendants disagree with this finding for several reasons. They say courts are generally

skeptical of public concern claims where the employee's speech is directed exclusively toward a supervisor in a private setting. *See Fox*, 605 F.3d at 347 (teacher's complaints to supervisors about an increased workload in private did not touch upon public concern); *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 364 (6th Cir. 2007) ("The fact that [the plaintiff] communicated solely to his superior also indicates that he was speaking in his capacity as a public employee contributing to the formation and execution of official policy, not as a member of the public writing a letter to the editor as in *Pickering*." (citation and quotation marks omitted)). While this factor cuts in Defendants' favor, the setting of the protected speech is not always dispositive. "Neither the First Amendment itself nor our decisions indicate that freedom of speech is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000) (quoting *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979)). Sanders's grievance was not personalized and touched upon what he perceived to be the threat of racial discrimination in SES's scholarship program; such a serious allegation (even if incorrect) should not be discarded simply because he chose to air it in a private setting. *See Leary v. Daeschner*, 228 F.3d 729, 738 (6th Cir. 2000) (although speech occurred in private, its subject matter touched upon public concern and was therefore protected); *Perry*, 209 F.3d at 608 (private conversation about racial discrimination was a matter of public concern).

Defendants further argue Sanders's complaints about the UNCF were incorrect and are therefore not protected by the First Amendment. Sanders concedes in his response the UNCF does not discriminate on the basis of race, requiring only that its scholarship recipients attend historically black colleges or universities. The validity of Sanders's concerns however is

immaterial to the present analysis. "Although First Amendment protection might not be available if the employer can show that the public employee knowingly or recklessly made false statements, a public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment." *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004); *see Rodgers v. Banks*, 344 F.3d 587, 601 n. 5 (6th Cir. 2003) ("[E]ven if [p]laintiff's opinion ultimately proved to be incorrect, this does not deprive her statements of First Amendment protection."). Accordingly, the true nature of the UNCF is immaterial so long as Sanders spoke on a matter of public concern.[3]

For the second prong of the analysis, the court must balance the employee's First Amendment rights with the employer's interest of promoting a smooth and efficient work environment. In weighing the competing interests, a court should focus on "whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1053 (6th Cir. 2001) (quoting *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir.), cert. denied, 513 U.S. 947 (1994)). Sanders comments did none of these things - his conversation with Owens was in private, did not attack SES's educational goals, seems to have had no impact on his co-workers, and was untethered from the relationship of trust between an employer and an employee. These factors indicate Sanders's interests are not outweighed by his state employer's desire to have an efficient

---

[3] Defendants' motion ignores whether Sanders either knowingly or recklessly made the claims of discrimination against the UNCF. Viewing the evidence in favor of Sanders however, such an argument would fail.

working environment.  *See Columbus Ed. Ass'n v. Columbus City Sch. Dist.*, 623 F.2d 1155, 1160 (6th Cir. 1980) (where complaints were not disruptive and in private, the interest of the public school did not outweigh the teacher's free speech rights).  Accordingly, the Court finds Sanders's statements about the UNCF and his decision not to associate himself with the organization were protected by the First Amendment.

Nevertheless, Sanders is incorrect that his refusal to work for the FAC triggered his First Amendment protections.  The Court is unsure what his grievances with the FAC position were, but it is clear they were not premised on his earlier concerns of racial discrimination.  Rather, judging from his emails with Owens, Sanders declined the volunteer opportunity for less altruistic reasons - he did not have time for it and was uninterested.  DN 17-5 at 5.  The above-stated racial concerns are not present and thus his complaints about the FAC are more readily characterized as a gripe about extra job responsibilities instead of one evoking a public concern.  Therefore, to the extent Sanders premises this action on his statements about the FAC or his failure to volunteer in this fund raising position, his claims are not cognizable because they do not implicate the First Amendment.

### b. Adverse action

The parties seem to agree Sanders has suffered an adverse action and either the January Reprimand or the September Suspension alone would satisfy this second prong and chill a person of ordinary firmness.  *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225-26 (2d Cir. 2006) (written reprimands constitute adverse action in the context of First Amendment retaliation cases); *Pierce v. Tex. Dept. of Criminal Justice, Institutional Div.*, 37 F.3d 1146, 1149-50 (5th Cir. 1994) (same); *Smith v. Fruin*, 28 F.3d 646 (7th Cir. 1994) ("[E]ven minor

forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect as more drastic measures."); *Kinross Charter Twp .v. Osborn*, No. 2:06-cv-245, 2007 WL 4284861, at \*13 (W.D. Mich. Dec. 3, 2007) (written reprimands constitute adverse action in the context of First Amendment retaliation cases); *McReynolds v. Wade*, No. 1:01-CV-1, 2001 WL 34079302, at \*4 (E.D. Tenn. Dec. 12, 2001) (same). Thus, the Court confronts each separately in addressing Defendants' disciplinary motives.

### c. Motivation behind Defendants' Actions

The Sixth Circuit has adopted the following burden shifting analysis for causation during summary judgment:

> [1] A plaintiff successfully demonstrates a causal connection between the adverse action and the protected conduct by offering direct or circumstantial evidence indicating that the protected conduct was a substantial or motivating factor behind the adverse action against plaintiff. [2] If the plaintiff meets his burden of establishing retaliation, the burden shifts to defendants to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. [3] Once this shift occurs, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant.

*Eckerman v. Tn. Dept. of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (internal citations and footnotes omitted); *see Jenkins*, 513 F.3d at 586. For a substantial and motivating factor, Sanders "must point to specific, nonconclusory allegations reasonably linking his speech to employer discipline." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Rodgers*, 344 F.3d at 602). This inquiry mirrors the but-for analysis of causation and asks whether absent the protected activity, the adverse action would not have been taken. *Id.* (citation omitted). "Unlike the burden-shifting analysis in Title VII cases, if the defendants meet their burden [in a constitutional retaliation action], the burden does not shift back to plaintiff to

show pretext." *Eckerman*, 636 F.3d at 208 n. 4 (citation omitted).

Sanders offers the following evidence of a connection: (1) the temporal proximity between the January Reprimand and his statements about the UNCF and refusal to volunteer for the UNCF and FAC; (2) poor marks in the April Evaluation for professional leadership, citing his decision not to help the UNCF and FAC; (3) Owens's statements to the Board during the Investigation where she expressed concerns that Sanders was unwilling to coordinate the UNCF initiative and had said the organization was racist; and (4) the temporal proximity between Sanders filing the lawsuit and the September Suspension.

### 1. January Reprimand

Sanders initially argues that because the January Reprimand followed only fifteen days after his statements about the UNCF, this alone is adequate to defeat this motion. Even though the Sixth Circuit has repeatedly cautioned district courts "about the permissibility of drawing an inference of causation from temporal proximity alone[,]" *Vereecke*, 609 F.3d at 400 (listing cases), few courts have dealt with such a brief period of time between the protected act and the alleged retaliation. In *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516 (6th Cir. 2008), the court of appeals reversed the district court's grant of summary judgment on a retaliation claim when an employee was fired on the same day his employer learned of a previously filed EEOC complaint. *Id*. at 525-28. In finding that mere temporal proximity was adequate to establish the inference necessary to defeat a motion for summary judgment, it warned that where the retaliation occurred almost immediately after the protected activity, an employee would be "unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively." *Id*. at 525. In *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir.

2004), the Sixth Circuit reversed a district court's dismissal of a retaliation claim where thirteen days separated the employee's filing of an EEOC complaint and his termination. *Id*. at 421-22. The court found the proximity between the two events provided sufficient evidence to defeat a motion for summary judgment. *Id*. Considering *Mickey* and *DiCarlo*, the proximity between Sanders's statements, his refusal to associate with the UNCF, and the January Reprimand leans heavily against summary judgment.

In addition, the presence of UNCF flyers in his SES mailbox, the comments in the April Evaluation, and the discussion of the UNCF in the Investigation Report are illustrative of a discriminatory animus. Finding flyers in his school mailbox on the heels of his conversation supports Sanders's allegations that his work environment became more charged after the January 6 meeting. The April Evaluation affirmatively links his refusal to work for the UNCF to a substandard job performance. Defendants may point to the other reasons listed in the April Evaluation for the low marks in the hopes of painting it with a nondiscriminatory hue, but the language's presence in the evaluation supports the inference that earlier discipline may have been motivated by Sanders's attitude about the UNCF. Furthermore, Owens's statements to the Board during the Investigation add to the inference that his stance on the UNCF was the motivating factor in the January Reprimand. The stated purpose of the Investigation was to determine whether Sanders had "made racially charged comments . . . and [if he had] made other derogatory statements regarding gender, race, and sexual orientation." DN 17-6 at 1. According to Owens, his unwillingness to coordinate the UNCF initiative and his statements that the fund was racist were pieces of evidence that would help to show Sanders's impermissible behavior the Board. At the very least, this reveals Owens disapproved of Sanders's comments and attitude on

the UNCF, believing them to be either racially insensitive or an incorrect characterization of the organization. It thereby lends weight to Sanders's beliefs that Owens was upset in the days following the discussion on the UNCF and that the January Reprimand was tainted by her emotions.[4]

Examining this evidence in the aggregate and in a light most favorable to Sanders, the Court cannot preclude the possibility of a reasonable jury finding in his favor. This is not to say Sanders has offered a great deal of evidence; indeed, he has avoided summary judgment by the narrowest of margins. Still, dismissal at this juncture would require an impermissible weighing of the evidence by the Court. For that reason, Sanders's remaining claims surrounding the January Reprimand may proceed to trial.

### 2. September Suspension

Sanders's assertions about the September Suspension however are less plausible. He claims it was retaliation for filing this lawsuit, his statements about the UNCF, and his refusal to volunteer for the UNCF and FAC. There is scant evidence to indicate this is the case.

Wedged between the January Reprimand and the September Suspension, Sanders had a number of serious and well-documented behavior incidents. The Investigation Report, which ultimately led to the September Suspension, targeted this unprofessional conduct from April to May of 2009. Mentioned within was his use of the racial slur during the May 14 meeting, instances where he threatened or questioned Owens's leadership in front of staff and parents,

---

[4] That the Investigation Report did not touch upon Sanders's refusal to volunteer for the FAC is dispositive in deciding it is not attributable to the January Reprimand. Without this additional inference in Sanders's favor, the Court does not believe a reasonable jury could find a connection between the two.

allegations of politically insensitive comments he made while teaching a class, and concerns about his behavior toward a parent in SES's parking lot. The Investigation Report refers only in passing Sanders's remarks about the UNCF and his decision not to get involved with the organization; it would therefore be unreasonable to conclude the September Suspension was retaliatory in nature, especially in light of the other documented incidents. Turning to the disciplinary letter informing Sanders of his suspension, Salman lays out a similar foundation for the punishment as the Investigation Report. Not once does the letter mention the UNCF, the FAC, or Sanders's lawsuit. Instead, it highlights the serious and well documented behavioral issues discussed above. Salman drives home the point in his closing paragraph:

> In [sic] future, you are expected to refrain from all derogatory statements based on race and gender. You will show respect to the students, faculty, and parents of the school to which you are assigned. Failure to do so will result in further discipline, including the likely termination of your employment.

DN 17-11 at 15. This language underscores the real reasons for the September Suspension: there were legitimate concerns about Sanders's interactions with members of the SES community and his tendency to use derogatory language. Ultimately, Sanders does not supply any evidence beyond speculation and conjecture that Salman's rationale for the September Suspension was disingenuous.

No reasonable jury could find Sanders's statements about the UNCF, his refusal to volunteer for the UNCF and the FAC, or the filing of the lawsuit were motivating factors behind the September Suspension - there are simply too many other, legitimate bases for this discipline. For that reason, his claims under the First Amendment with regard to the September Suspension are dismissed.

## II. Reverse Race Discrimination Claim

Sanders, a Caucasian male, asserts the January Reprimand, the denial of his grievance for this reprimand by Meredith, and the September Suspension were motivated by his race, in violation of the KCRA. *See* KRS § 344.280(1). Defendants argue that no direct or circumstantial evidence supports such an allegation.

Race discrimination claims under the KRCA are subject to the same analysis as analogous claims under Title VII. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000); *Ky. Comm'n on Human Rights v. Commonwealth, Dept. of Justice*, 586 S.W.2d 270, 271 (Ky. Ct. App. 1979). A prima facie case for discrimination in the workplace may be shown either through direct or circumstantial evidence that supports the inference of discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). If there is direct evidence, then a plaintiff may avoid the burden shifting analysis discussed below. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995). Though Sanders refuses to admit there is no direct evidence of discrimination, the record is devoid of the type of evidence courts typically use to bypass the *McDonnell Douglas* test. *See Bartlett v. Gates*, No. 09-3823, 2010 WL 4723786, at *4 (6th Cir. Nov. 15, 2010) (discriminatory remarks by management were direct evidence); 45 Am. Jur. 2d *Job Discrimination* § 2384 (collecting cases). As such, the Court discards the direct-evidence analysis.

With only inferential evidence of race discrimination, Sanders's claim must survive the burden shifting test described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). The test is as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant

carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252-53 (internal citations omitted).  Imbedded within the first prong are the requirements for a racial discrimination case.  For a prima facie case of reverse race discrimination, a plaintiff must show that (1) "the defendant is an unusual employer who discriminates against the majority," (2) the plaintiff satisfactorily performed the job, (3) the plaintiff was impacted by an adverse employment action, and (4) "the defendant treated minority employees who were similarly situated to the plaintiff more favorably than [the plaintiff]."

*Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 339 (6th Cir. 2009); *see Schwarzmeier v. Allegheny Cnty. Jail*, No. 09-cv-0818, 2010 WL 2898802, at *4-5 (W.D. Pa. July 22, 2010) (providing "satisfactorily performed" language) (citation omitted).

Sanders relies on the evidence previously discussed in Section I to support this theory: the statement in the April Evaluation, the passage in the Investigation Report, and a general feeling that Owens was "loyal" to the UNCF and its goals.  After reviewing this evidence, the Court concludes he cannot establish two factors for a prima facie case: he satisfactorily performed his job and he was treated differently than other minority employees.

a. Satisfactory Performance

The facts addressed in Section I show that Sanders did not satisfactorily perform in his position.  He was insubordinate in his refusal to answer his supervisor's questions, derided Owens in front of parents and staff, spoke loudly at a parent in SES's parking lot, was politically insensitive in teaching a class, and used a racial slur in Owens's presence.  His behavior was commensurate with neither SES's nor society's expectations of an educator.  He has therefore

19

failed to meet this prong for a reverse race discrimination claim.

### b. Different Treatment than Similarly Situated Employees

"In order for . . . employees to be considered similarly-situated . . . the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the minority employees who he alleges were treated more favorably." *Morris*, 320 F. App'x at 340 (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). "Where an employee alleges discriminatory disciplinary action, . . . 'the individuals with whom the plaintiff seeks to compare his/her treatment must . . . have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Sanders's response does not list any other employee of SES or the Jefferson County school system.[5]  In fact, Sanders makes no mention of any actor other than himself who was the subject of a disciplinary proceeding.  Since he has failed to compare his behavior to another member of the SES community, he has not made a prima facie case on this element as well.

### c. Sanders's Response

Instead of focusing on the *McDonnell Douglas* test or the requirements for a claim of reverse discrimination, Sanders analogizes this matter to *Mandell v. Cnty. of Suffolk*, 316 F.3d 368 (2d Cir. 2003) and *Venters v. City of Delphi*, 123 F.3d 956, (7th Cir. 1997).  Both cases involved law enforcement officers who brought claims under Title VII to protest discrimination

---

[5] Defendants allude to another employee in their motion named "Vanessa."  It is unclear who this person is or how her actions compare to those of Sanders.  Either way, since Sanders does not recognize her in his response, the Court finds her irrelevant to these proceedings.

against them on the basis of religion. In *Mandell*, the court of appeals indicated that since management of the police force was discriminating against non-Catholics, the plaintiff did not have to show his particular religion was a specific target. *Mandell*, 316 F.3d at 378. Sanders says that Owens's devotion to the UNCF is similar to management's devotion to their prospective religions in *Mandell* and *Venters*, and therefore he should be relieved from showing Defendants' actions were discriminatory against his specific race.

The Court respectfully disagrees. Sanders's contention ignores the established law for reverse race discrimination explored above. Nor does it relieve Sanders from satisfying the *McDonnell Douglas* test to defeat this motion. Without delving too deep into the analysis, he is incapable of showing by a preponderance of the evidence that the January Reprimand, the denial of his grievance, and the September Suspension were all a pretext for discrimination. Ergo, this theory of recovery is dismissed.

### III. Due Process Claims

Sanders further charges in his complaint he was denied due process of law on two separate occasions. First, he says that during his meeting with Owens on May 14, 2009, he had a right to cross examine her on certain aspects of her investigation. He continues, stating that since his suspension was the result of him asking Owens a question (how she would feel if someone called her a "nigger"), this punishment was a violation of his due process rights. Second, Sanders alleges that after the May 14 meeting, he was transferred to non-teaching duties. He says he received no notice or a reason for this transfer and no opportunity to be heard, all in violation of his rights.

The Court must answer two questions to analyze Sanders's proposed due process

violations: (1) does he have a property interest sufficient for due process protection; and (2) if he indeed possesses such an interest, what is the proper amount process to which he is entitled? *Leary v. Daeschner*, 228 F.3d 729, 741-42 (6th Cir. 2000). Neither party contests that Sanders has a property right in certain requirements of the collective bargaining agreement ("CBA") between the Jefferson County Teachers Association and the Board. *See Baar v. Jefferson Cnty. Bd. of Educ.*, 311 F. App'x 817, 825 (6th Cir. 2009) (finding property interest in the CBA for Jefferson County school teachers); *Jefferson v. Jefferson Cnty. Pub. Sch. Sys.*, 360 F.3d 583, 587 (6th Cir. 2004) (same). Rather, Defendants argue Sanders was provided with the appropriate amount of process.

If an individual does possess a property interest, deprivation of that right must be "preceded by notice and opportunity for a hearing appropriate to the nature of the case." *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532 (1986). The query of "how much process is due" is one of "federal law and thus is not limited by the procedures that the state may have deemed to be adequate when it created the property right." *Id.* (citation omitted). However, the process does not have to be elaborate and is subject to change depending on the competing interests. *Higgins v. Jefferson Cnty., Ky.*, 344 F. Supp. 2d 1004, 1007 (W.D. Ky. 2004) (citations omitted). "The specific dictates of due process are determined by considering factors such as the employee's interest in retaining employment, the governmental interest in the expeditious [discipline] of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous [discipline]." *Id.* (describing the process as it applies to termination) (citations omitted).

Sanders's declaration that he had the right to cross examine Owens during the May 14

meeting is undermined by both the CBA and analogous legal precedent.  The CBA contains the

following provision about employee discipline:

> Any employee who is to be reprimanded in writing or formally disciplined by the
> Employer or its agents shall have the right to a meeting with the
> Superintendent/designee.  A representative of the Association may be present when
> requested by the employee.  Any employee who is to be reprimanded in writing shall
> have the right to a meeting with the person issuing the written reprimand.

DN 23-2 at 10.  Even if Sanders had the right to a pre-discipline meeting, there is no mention of

a right to cross examination his supervisor.  Reading this section in context with the CBA,

Sanders may only hear the evidence against him and present his own side of the story.

Questioning Owens on what her reaction would be to a hypothetical situation falls outside of the

protections imagined by the CBA.  Furthermore, other courts have concluded that an appropriate

due process hearing for an employee is possible without the right to cross examine.  *See e.g.*,

*Catlett v. Woodfin*, 13 F. App'x 412, 415 (7th Cir. 2001) ("due process does not give public

employees the right to confront or cross-examine witnesses at a pre-termination hearing.");

*Burrell v. Bd. of Trs. for the Univ. of Me. Sys.*, 15 F. App'x 5, 6 (1st Cir. 2001) (no right to cross

examine witnesses during pre-termination hearing); *Gunasekera v. Irwin*, 678 F. Supp. 2d 653,

663-64 (S.D. Ohio 2010) (no cross examination necessary for professor at name-clearing

hearing).  The cases Sanders offers in support are distinguishable and therefore discarded.

Sanders's second assertion - that he was entitled to more process before his reassignment

to a non-teaching position - is equally unpersuasive.  Sanders may have a property interest in his

position with the Jefferson County schools, but the same cannot be said for a classroom versus a

non-classroom position.  Defendants' contention that a teacher may be temporarily assigned to a

non-teaching role without triggering due process procedures is supported by earlier decisions.

*See e.g.*, *Eggers v. Moore*, 257 F. App'x 993, 995 (6th Cir. 2007) (putting teacher on paid forced administrative leave did not require due process hearing); *Edwards v. Ca. Univ. of Pa.*, 156 F.3d 488, 492 (3d Cir. 1998) ("[T]emporary removal from class duties . . . does not constitute a deprivation of employment."); *Adams v. N.Y. State Educ. Dept.*, 752 F. Supp. 2d 420, 452-54 (S.D.N.Y. 2010) (collecting cases); *Joseph v. City of Columbus*, No. C2-04-754, 2006 WL 2795195, *6-7  (S.D. Ohio Sept. 27, 2006) ("[E]mployers may avoid due process concerns in cases in which immediate suspension of an employee is necessary by placing that employee on paid, rather than unpaid, leave." (citing *Loudermill*, 470 U.S. at 538)); *Lynch v. McNamara*, 342 F. Supp. 2d 59, 65-66 (D. Conn. 2004) ("[R]eassignments and transfers generally do not implicate a protected property interest for the purposes of due process, unless accompanied by a loss in pay.") (citations omitted).  As Sanders received full pay and benefits during his temporary reassignment, such action may not form the basis of a due process claim.

### IV. Statutory Retaliation Claim

In the latter parts of his response, Sanders attempts to tie his September Suspension to the filing of the lawsuit in June of the same year.  DN 23-1.  He claims this was in violation of the KCRA.  For the reasons explored above, this argument is flawed.  The documentation surrounding the September Suspension focuses principally on the complaints of parents and teachers about Sanders's unprofessional behavior.  His assertions are incorrect that the temporal proximity between the two events is sufficient to defeat this motion.  *See Vereecke*, 609 F.3d at 400.  Finally, even if he could satisfy the prima facie case, he cannot show by a preponderance of the evidence the disciplinary action was mere pretext.  Accordingly, this statutory retaliation claim is improper.

**CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED this motion for summary judgment (DN 17) is GRANTED IN PART AND DENIED IN PART.  Sanders's claim for retaliation for the January Reprimand regarding his statements about the UNCF and his decision not to volunteer for the UNCF may proceed to trial.  All of the other alleged theories of recovery are hereby DISMISSED.

In so deciding, the Court recognizes certain individual Defendants may not have been involved in the decision to issue the January Reprimand.  Rather than exploring the record and dismissing these parties, the Court will permit the Defendants to submit a motion in limine to dismiss these individuals within five days of this order.  Plaintiff shall then have five days to respond.  The Court shall then determine which Defendants should proceed to trial.